American Housing Foundation owes debts to Mr. Templeton. One, as a general partner. Second, under its written guarantees provided to Mr. Templeton. And third, on Mr. Templeton's claims of fraud, breach of fiduciary duty, and money counts. The guarantees, the trial court below re-characterized the transactions, didn't specifically say the guarantees, but re-characterized the transactions and subordinated them. However, the guarantees, which are what is in issue, the guarantees given by AHF to Mr. Templeton do not defy interpretation. They don't frustrate legal analysis. They're not nonsensical or even novel, particularly in the world of low-income housing tax, the low-income housing tax industry. Congress clearly sought to encourage investment in low-income housing through the use of tax incentives. Let me ask a question. I printed the disclosure statement. And the disclosures, he finds himself, I take it, in class 18? I can't remember off the top of my head. Well, at the bottom, let's put it that way. Right. Because there isn't any equity in the thing. So basically, he's at the bottom of the pecking order here. That's correct. Which means he gets nothing. Well, it... Right? Or is this thing... He gets nothing. I'm sorry. Do they actually have something? Yes. Yes. There actually is potential for a reasonable, I mean, under the circumstances, a reasonable dividend. In this particular case, Mr. Templeton led the efforts to chase down and acquire $27 million worth of life insurance proceeds that had been fraudulently transferred and were about to be shipped to the islands. That was very early on. That's what... Well, he was chair of the creditors' committee at one point, wasn't he? That is correct. And then at some point, he was removed probably because... Was there any particular reason for that other than that he had a huge debt? Well, the reason for that is because there was a battle between the unsecured creditors' committee and the newly appointed trustee, a battle which was precipitated over the fees that the trustee was asking for. So there was a planned battle. And in order to remove certain... They've admitted that. In order to remove certain people from the unsecured creditors' committee, including Mr. Templeton, they brought suits, this particular one, against Mr. Templeton. There was... Mr. Horton was also on the unsecured creditors' committee. He was sued, as well as Mr. Templeton's partner, David Miller, and eventually Mr. Burgess. And as a result, the planned battle ended up getting resolved through negotiation. Well, under the terms of this plan, the way the disclosure statement reads, the fact that Mr. Templeton and I guess others had these gigantic tax deductions somehow qualified them for the honor of the treatment that Mr. Templeton ultimately got. That that was the basis for the trustees' objections and the trustees' transfer claims. And so in the plan, they grouped all those people together to whom they objected on these bases and to whom they had fraudulent transfer claims on these bases. They grouped them into a class. And that's what you're seeing. Now, that was done very early on when the litigation just began. So they grouped them into a class. And that's, I mean, that plan is fixed. I mean, there's no appeal from that anymore. That's true. That's true. So it's a question of whether or not, how those cases turn out. Whether or not... The individual cases. That's right. That is correct. And they've gone, there have been some, there are some Yeah, that was, the possibility that that would happen was clear in the disclosure statement that within that class, people were going to be treated differently. That is true. And we're, so now we're winding down, finally, the litigation associated with what you're seeing there as that class. Okay. But there is still, in spite of a whole lot of money being spent out of that $27 million, there's still, I think, the last report was about $10 million left in the state that people are fighting over. Now, of course, the basis of the claims, Templeton's claims, are guaranteed fraud, breach of fiduciary duty, and AHF in some of those partnerships as a general partner, just simple black-letter law, the general partner is liable for the debts of the general, excuse me, the limited partnership. So those are the three bases for the claims. The approach that the trial court took was to re-characterize, and we believe the trial court erred in the manner in which he approached this and in doing so. What we have, and it's, when we read the court's conclusions and findings of fact in this case, what we see is the trial court focusing on the conduct of the creditor and the risk that the trial court deemed associated with these transactions in order to reach a conclusion on re-characterization. However, we believe that was improper methodology when, because there's a distinction in equitable subordination and re-characterization. Equitable subordination, of course, is focused on the conduct of the creditor, whereas re-characterization, which is what the trial court did, is focused on what is the nature of the transaction that is being analyzed. And when you read the findings of fact and conclusions of law, what you see is that the trial court was focusing on the conduct of the creditor. But, and we have this juxtaposition here because with equitable subordination, which does focus on the conduct of the creditor, there's another element that's key, and that is that there is harm to the creditors. The court found here and in every one of these cases, in that bankruptcy, that the alleged, what the trial court called the tax schemes, the one and only reason, the one and only basis that the trustee had for challenging and objecting to these claims, the court found that this tax scheme did not harm creditors. Yeah, that was, I mean, you know, what you get from reading the disclosure statement is that this is just immoral, you know. I mean, the size of these tax deductions, but I don't see how that, the size of these tax deductions harmed the other creditors or the debtor here. I don't get it. Neither did the trial court. Well, I mean, and then I ask you the question, well, but that is what you've got in this plan. I mean, the disclosure statement says they just were illegitimate deductions. Well, I mean, that's a problem for all of us, the taxpayers, but how does, what's the basis for saying that that harmed the other creditors? The trustee even stipulated in this case that their only claim to harm was that if these claims are allowed, they would reduce the dividend to the other creditors, which, of course, is not harm to the creditor estate. That would mean every claim in a bankruptcy harms the creditor estate. And so the trial court properly found in all the cases that given the nature of the trustees' claims, which is all centered on what they call this tax scheme, that there's no harm to the creditors. And so without harm to the creditors, there's no basis for equitable subordination. I take it that these creditors in this class did not vote. Did they vote in favor of the plan? Some did. Some didn't. So it didn't carry, or it did, or what? It did finally carry. Now, it was until there was a negotiation with a few who decided to go ahead and vote for the plan, and so it ultimately carried. Okay. I thought what the bankruptcy judge did was kind of back off and look at Mr. Templeton's purpose for going into this investment, and the overriding purpose was not to get repaid the debt. It was to get a tax advantage, and that sounds more like equity than debt. Well, except that, once again, that is a focus on the wrongness or rightness of Mr. Templeton's intentions. Well, I don't know that it's wrongness or rightness. It's just what was it? Was his purpose for going into the investment to get the debt repaid, or was he not particularly worried about that? He wanted to get the tax advantage. The testimony is from Mr. Templeton that he went into these investments because of his history. He had been an investor with AHF-related entities for many decades, going back to at least 1996, and what he had realized over the years were good returns, occasionally, not all. Some of the investments threw off tax deductions, and he had had a good, successful relationship with Sterkle and AHF. Then what we get into in these cases, and by the way, I've given the court a handout that's kind of a summary of the entities and the nature of the investments because it's easy to trip over those things. But in these transactions, Mr. Templeton's testimony was that he was interested in those investments first and foremost because of the high return they provided plus the good history he had had. The trustee said, oh, no, gosh, bundled them all up, conflated the entities, and said, well, it was just all one big tax scheme. It was all tax motivated. Well, a bankruptcy judge also said, you know, this is a pretty thinly capitalized entity, and he maybe didn't necessarily believe that. I mean, even though the guy had a good reputation, he put up startup money, which sort of sounds more like equity than debt, and his ability to recover the money, even if the guy had a sterling reputation, wasn't very good. There's several aspects to your question, Your Honor. Part of it is, and a very, very critical part of it is, and a problem with the underlying analysis is that did Mr. Templeton intend to make an equity investment? He certainly did in the limited partnerships, and he did make equity investments in the limited partnerships. The question is AHF, the debtor. That's who the debtor is. None of those limited partnerships are debtor, just American Housing Foundation, which is a nonprofit entity in which Mr. Templeton did not take, by any documentation or any testimony, did not take any type of equity interest in. He did in the limited partnerships. What AHF did was provide a guarantee to Mr. Templeton and others that there would be certain guarantees that if the limited partnership didn't make it and couldn't pay back the amount of the investment, or in a few of them, the amount of the investment plus return, then AHF would guarantee that. But that was for one year. The maturity, yes, ma'am. The guarantee. So what I don't get, say take Mr. Templeton. Okay. He got a limited partnership interest, say, in one of these limited partnerships, and he got a guarantee from the debtor here that at the end of the year, in effect, he could get his money back. If it didn't pay off. Yeah, now, but if you're talking about the long-term return on one of these things, that wasn't going to be ‑‑ it was a long-term return. It wasn't going to be realized in the first year. So in a sense, what he had, I take it, was a put? Well, no. There could be a return in a year. Based on the representations that start playing. And let me step back and just say that after the fact, and as a result of the millions of dollars worth of investigation, we all now know Steve Sterkwill was a liar and a cheat. And he made representations about what he was going to do with these partnerships, and, in fact, he didn't do any of those things. He just took the money. So, of course, that is another problem. You can't analyze Mr. Templeton's intentions or the nature of the transaction based upon what you find out in hindsight. As this court has held several times, you have to look at the nature of the transaction of what people knew at the time they entered into it. Well, what if you assume, though, the accuracy of the bankruptcy judge's finding that Mr. Templeton's focus on getting repaid was down the line somewhere from his interest in getting a big deduction, tax deduction, that it was a secondary, at least, concern? Now, where would that leave us? Well, even if you presume that, which we don't, and we've got evidence to show why, but even if you presume that, it ultimately doesn't matter because the – this activity didn't harm any creditors. And the judge also found Mr. Templeton was in good faith and gave value in the amount of his investments. And by finding those things and giving deference to the trial court's findings, then the result is that you have allowable claims. What about the – I thought the bankruptcy court relied on the IRS factors that look at whether a guarantee is really a debt or is in fact equity and went – took those IRS factors and went through them all. Well, what he did, he identified the factors in the recharacterization cases like the loafing case. He identified those. Those, of course, come from a whole series of tax cases. That's true. And so he identified those. He basically just picked some of those factors, and those were the basis of his analysis for recharacterization. When you look at the factors that the court was relying on, what he was really going to is, as Judge Davis was pointing out, is his analysis of the risk versus Mr. Templeton's behavior in light of those risks. But that doesn't apply here. That doesn't work here because when you look at the transaction, what the transaction is is an equity purchase in the limited partnerships. I thought the IRS was worried about that very thing, at least in cases where the general partner would be American AHS. They didn't care about that. The IRS said we're worried because this can be used as a – it's just a tax scheme, and so they have these factors. Well, in a different context, and if you look at those cases, the context is – and I've got to point this out because it is a very interesting point. All of those cases that lay out these recharacterized factors are tax cases, and not one place in any of those cases does the court – has the court considered the investor's tax reporting or whether or not the deduction eventually held up. But be that as it may, what the court did then is he took those factors and applied it. If you look at the findings of fact and conclusions of law, he never deals with the fact that their equity investments, which Mr. Templeton made, those equity investments were in limited partnerships and not AHS. I thought that was the whole point of the IRS's analysis, when there are so-called equity investments in limited partnerships, and the IRS determines whether you look beyond that and recharacterize them. It's not that broad and easy to apply, Judge Owen, because – and what the courts have said and what this court said is that you have to look at the facts of every different case. And it's very fact-intensive. And here what we have, because of the nature of that, remember that the question – in these cases, if you'll look, you'll see that the debtor is the party who has given equity or has claimed to have given equity. Yeah, here there's this three-cornered arrangement, which is very atypical. You've got the AHS or F, I forget which. HF. F. You've got AHF out here on the side. The equity went into these partnerships. That's correct. And yet, in a sense, Mr. Templeton is being classified as equity in AHS F. Right. Very peculiar. Well, it's peculiar in terms of cases that have come up. Yeah. In the low-income housing industry, it's not peculiar at all. It's not. In fact, it's the norm. And we've provided some authority for that. It's the norm. And not only have we provided authority, even the trustee's own expert who testified on insolvency, he talked about there's lots of guarantees. I think he applied $27 million worth of equity guarantees that AHF had provided to tax-credit partnerships, which they did not challenge. And, in fact, their experts said, well, those tax-credit equity guarantees are debt. He classified those as debt and used that to calculate insolvency. But then with ours, which were structured, not exactly the same but the same basic entity structure, they said, no, no, no, no, those aren't debt. Why? The only reason they gave is because tax scheme. We say it's a tax scheme. Therefore, since it's a tax scheme, then they're not allowed to judge it. Let me ask you one question, which is sort of journeyman. But Mr. Templeton put in, say, $250,000 into a partnership, and the thought was that he would be able to claim almost $2 million in deductions for that year. And is that because of operating losses that were going to be created by the partnership? Or how do you get from $250,000 to $2 million in a partnership? Of course, it depends on each partnership because the different partnerships were allegedly structured differently, according to Sterple. The one you're referring to, I believe, is called M2M No. 2. It means marked market, limited partnership No. 2. That one was the basis of that deduction, as reported by Sterple, was a charitable donation of an asset that had capital gains. And that is an approach that is used all the time by foundations and charities and had been used for many years by AHF and audited by the IRS on multiple occasions. So what? Tell me how that works. The way that works is if I've got—and the way it worked for them, if they had—they would go acquire a run-down apartment complex that's worth, say, $100,000. Then because of the very unique benefits that a foundation involved in low-income housing can bring because of these incentives of the government, if they go in, fix it up a little bit, qualify it. If they go apply for low-income housing tax credits and get qualified, awarded those low-income housing tax credits, suddenly the value of that apartment complex has just shone up because of that. And so AHF has brought value. Now they have one that's worth— Okay, so it isn't a function of operating losses because that—it's a function of tax credits that are special to this industry. In that case, yes. Now there are some other partnerships that the deduction was a function of operating losses. Okay. And the representation by Mr. Sterkle was that we're going to use this partnership—limited partnership is going to use funds that are contributed. And with those funds, we will go out and spend the things that you've got to spend to be able to— Fix it up. Put a deal together to make it qualify for low-income housing tax benefits. And then that will allow us to roll it into a new partnership at a higher value, and you'll get paid back the money. So the money you spend this year is an ordinary loss, but next year hopefully you're going to make that back plus money. Now those are the partnerships with ordinary loss. And real quickly before I sit down and—is with respect to the tax partnerships, what's important is when you look at each one, there's one in particular that really I think shows the faultiness of just wrapping everything together, conflating all the entities, conflating all these partnerships and saying, see, there's just a tax deed. And that's the Gauss Number One Partnership. And the Gauss Number One Partnership, that was the first one. And in that one, it turns out that Sturteville had prepared K-1s that would have given Mr. Templeton I think like a $1.7 million deduction, according to the K-1, on Templeton's $250,000 investment. Templeton never took the deduction. Templeton never saw the K-1. The K-1 came in the year 2007 when Mr. Templeton had extraordinary income as a result of selling an oil and gas partnership. He never knew about it. He never knew about that K-1 until after he'd been sued and all the deductions—all the allegations in this case. The result of that is how can you say that Mr. Templeton was tax motivated when he had such a glaring big deduction that he never knew about, never went and asked for, never got? That was the shining example. But there's others of these partnerships that threw off no tax deduction. None of those partnerships, none of the transactions even mentioned tax deductions anywhere. The only testimony is that he was expecting some tax—he was not going to be surprised at tax deductions from some of the earlier partnerships. He was expecting ordinary loss deductions, as I discussed with Walden, too. He was expecting no deductions from Gray Ranch, and he was tax motivated on the Hurriak transaction, which he dropped after the court made a ruling on that particular transaction in another case. Okay. Thank you. Thank you, sir. Thank you. Okay, Mr. McCartin. Thank you, sir. Good morning. Police and court. I'm Steve McCartin. I represent Walter Ochesky, trustee. Mr. Templeton filed claims in the HF bankruptcy proceeding in approximately—an approximate amount of $5 million. We objected to all of those claims in our adversary proceeding, and we also sued Mr. Templeton to avoid approximately $1.3 million of preferences and fraudulent transfers. The court avoided $157,000 worth of transfers in the preference period, as preferential transfers, but denied the trustee's fraudulent transfer cause of action despite extremely egregious findings of fact as to conduct of Mr. Templeton. As the court may recall, but after 11 months of trial on and off, we think over 30 days of trial, the court found that Mr. Templeton was an extremely sophisticated, shrewd, successful businessman and attorney. He found that Templeton was clearly complicit with Sterckel in the tax scam, in the tax scheme. He found that Templeton never questioned any of the deals. He found that Templeton turned a blind eye to the strangeness and the suspicion of the transactions. He found that Templeton knew or should have known he was involved in an illegitimate tax scheme. And most importantly, he found, at best, he was willfully blind, hinting that he may have actually done it. I don't understand why the fact that this was, quote, an illegitimate tax scheme forms a basis for the treatment of him under this plan. I don't get that. I mean, no, I've seen bankruptcies of tax shelters, had a little experience in that respect. But I don't understand why that fact alone justifies what happened here or justifies the merit, the hit that Mr. Templeton is taking because of it. And I understand your question. The tax scheme is not unrelated to his claim. The tax scheme is an integral part of how his claim arose. Mr. Templeton invested in a partnership that had no economic substance and was really a sham transaction documented for a tax fraud. AHF had legitimate partnerships, and AHF had apartment complexes and a legitimate business. But these partnerships that Mr. Templeton invested in were sham partnerships. They were subterfuges. They were created to funnel tax benefits to an investor like Mr. Templeton. So what you're saying is that they didn't really have, you know, after Mr. Templeton put his money in, that they didn't actually get up and do what they had said they were going to do. Absolutely. The bankruptcy court found that they had no economic substance, no economic reality, that they had no operations ever, had no assets ever, had no employees. They were mere sham entities created to falsely document a tax fraud to the IRS. Yes, but the bankruptcy court didn't find that Mr. Templeton knew about that when he made the investments. At least not all of them did. I think he did, Your Honor. I think he found that— He said he had good faith. Well, he did. But he said that Mr. Templeton was clearly complicit with Sterkle at the threshold of each of these deals. He found that Mr. Sterkle's tax deductions were all illegitimate. He found that he knew or should have known he was participating in an illegitimate tax scheme. Now, I think the heart of a lot of the issues on appeal today are why does that affect the bankruptcy estate? Why is that relevant? How does that harm creditors of the bankruptcy estate? And we believe here's how it does. It wasn't—this tax scam in which Sterkle gave out over $100 million of illegitimate tax deductions, $8 million of which to Mr. Templeton. This was not divorced from the AHF Ponzi scheme, an illegitimate scheme. This was the bait that Sterkle and AHF used to lure investors into investing with AHF so that he could then perpetrate this fraud, so he could perpetrate this Ponzi scheme. He would go to these investors, and he would say, if you will invest, I will give you A, 18 percent interest in one year, and B, tax deductions that sometimes were 10, 15, 20 times your investment in a very short period of time. You're exactly right. The trustee doesn't have an interest in whether Mr. Templeton pays his taxes or not. That's not our job. Our job, however, is to look at the Ponzi scheme and the fraudulent transactions that gave rise to these claims. So what Sterkle did, he went to Mr. Templeton on an example you used. I think Mr. Lovell gave you the wrong deal. It was a deal called HER Act. The evidence was unequivocal that he sat down with Mr. Templeton on December 16th at lunch, and he said, if you will give me $200,000 investment, an equity investment. Now, that's the last deal. The last deal. And it's not at issue here, is it? That's right. He withdrew that claim at the eve of trial, but we think it's evidence of how the other deals worked also. We, of course, weren't there, and we don't have – we can't tell you exactly what was said, but from the circumstances we proved – That's a factual matter, isn't it? Yes. Within the backbinder discretion. If there's some evidence, either way we have to find them. And that's right. And the court found that. The court found that all of these deals were illegitimate and that Mr. Templeton was complicit. Right? He didn't go deal by deal, though, did he? Did the bankruptcy judge make findings on each deal? What Templeton knew when he went into each deal? I think you're right. I think he lumped them together and said that they were all – that Mr. Templeton invested $5 million in six deals. He received $8 million worth of deductions and that they're all legitimate. Our main point on appeal, Your Honor, is this is not unrelated improper conduct. If Mr. Templeton was cheating on his wife and that's improper conduct, that doesn't have anything to do with these investments and these claims. Just like in Stanford. Mr. Stanford lured investors into his Ponzi scheme by promising them CDs that would pay them huge rates of return, huge interest. Sterkle's bait to get him into the Ponzi scheme was that he promised them these huge tax deductions. Our premise is that that did harm creditors in the estate because the Ponzi scheme by definition harms creditors in the estate. It allowed AHF to continue operating while insolvent, creating new creditor claims, probably deepening insolvency, if you will, and that harmed creditors in the estate. That it's harmful to creditors in the estate to take an entity that was insolvent way back in 2005 or 2006 and allow it to continue operating and incur new debts for years because it was – Well, all of this sounds – you know, it sounds horrific. But at the same time that Mr. Templeton was supposedly aiding and abetting this Ponzi scheme, which is what you're saying, the court makes a finding of good faith on some aspects of the deal. I mean, I don't – You're exactly right. The court said – and that's our cross appeal. The court said we know you were complicit, Mr. Sterkle – or Mr. Templeton. We know you knew or should have known. We know you turned a blind eye willfully to the fraudulent tax scheme. In this case it said, but I don't think creditors are harmed by the fact that you're cheating the IRS on taxes. That's exactly contrary to the bankruptcy court's ruling in Ochesky v. Horton that was appealed up to this Fifth Circuit, and the Fifth Circuit affirmed in 2013. In the Horton case, the bankruptcy court specifically found that Mr. Horton knew or should have known of the tax scheme, and that was conduct that meant he did not act in good faith and he did not get to good faith defense under 540HC. And we have two cases. The Horton case that came out of the AHF bankruptcy proceeding that came up to this court where the Fifth Circuit – where the bankruptcy court and the Fifth Circuit affirmed knowing – knew or should have known of the illegitimate tax scheme was enough to deny the good faith defense. We have almost virtually facts, virtually the same facts here, where the bankruptcy court injected a new element, harm or fraud on other creditors. So number one, our appeal was we don't think that is an element in any of the body of the case law, the good faith case law, that exists up until today in this case. We don't think it's an element of 540HC. Number two, even if it is an element, there is in fact harm. There is in fact damage to the estate by the Ponzi scheme by definition is damage to the estate. Well, to me it's – you're talking about two different things, though, about knowledge of the tax scheme and knowledge of the Ponzi scheme. Now, I thought the bankruptcy court found that he didn't – that Templeton didn't know about the Ponzi scheme until really late in the game. That's exactly right. I'm not saying that he knew or should have known of the Ponzi scheme. It was knew or should have known of the tax scheme, which should have put him on inquiry notice to look further into the deal before he entered into the deal. And we believe that he was on inquiry notice and that each of these red flags, that you can't get $2 million worth of tax deductions for a $200,000 – Well, you do in some types of deals. You do actually. I mean, it does happen, and it even gets through audit. So, I mean, you can't just say you don't do this. You have to put meat on the bones. We asked his tax expert. We asked Mr. Templeton's tax expert on the stand. Let's assume Mr. Templeton, at this meeting, with this particular pitch from Sterkwolf, picked up the phone and called you for a two-minute conversation, and he said, I'm at lunch with a guy, and he's saying if I invest $200,000 today on December 16th, he will get me a $2 million deduction by the end of the year. Would you tell him that sounds fine, go ahead and do it, or would you tell him we need to know more about that? We need to do some due diligence before you would enter into that transaction, and I think that's a test under law. Would it put him on inquiry notice to look further? Mr. Templeton's not a tax accountant, and again, these seem to be factual issues. I mean, if you're contending that the wrong test was applied, that's one thing, but if you're saying that he applied the correct test and came out with the wrong answer, that's a factual issue, isn't it? We are actually saying the court was spot on on its findings of fact. The findings of fact, we believe, were absolutely accurate. We're saying when he took those facts and applied them to the 548C good faith defense on good faith, and he said, in essence, he's guilty of improper conduct. I just don't think it harmed creditors, therefore he still gets the good faith defense. We think that was a mistake because he was part and parcel of an illegitimate scheme that did harm creditors. Secondly, and just as equally as important, as you know under 548C, 548C says to the extent you give value and you act in good faith, you are entitled to retain what you obtain up to the extent of value provided to the debtor. So the good faith defense has two elements, not just one. It's just not good faith. To get the good faith defense, you have to not only have acted in good faith, you have to provide value to the debtor. The bankruptcy court in our case made a correct finding of fact. He said expressly, I find that AHF received no value for these guarantees because, remember, AHF only owned a fraction of the partnerships that it guaranteed the debt. So what the bankruptcy court said during one of his findings of fact was AHF received no value for executing guarantees of these shell partnerships in which it usually owned 1% of the last partnership. Later, when he was talking about applying the good faith defense, the bankruptcy court said, well, clearly Mr. Templeton gave value to the extent of his investment, but he didn't say value to the debtor. And he's right. Clearly Mr. Templeton gave value to the partnerships by making an equity investment in the partnership. But that's not the test under 548C. 548C is to the extent of value provided to the debtor. Well, if these entities were shamed, AHF did get the benefit. It raided the development's bank account, traded its own and got the cash, got the money. And that was expressly the issue in the Horton case that came up to the Fifth Circuit on appeal in 2013 and was affirmed. In Horton, the court said Mr. Horton made his – extended his value to the partnership that was called Whitechapel. His check was made payable to AHF because Whitechapel didn't have a bank account. And AHF took the money and spent it on what we believe was paying previous investors and paying some bills. And so Mr. Horton argued there's value. AHF got to use the money. The bankruptcy court held that's not the way it works. Your investment, your transfer was to Whitechapel. It makes common sense that you would make the check out to the general partner because Whitechapel didn't have a bank account. And we find that if AHF took the money out of Whitechapel, that gives a claim by Whitechapel against the general partner, not the limited partners. That's a second-tier claim. So the bankruptcy court found your value went to the partnership, not to the debtor. That's not value for 540HC. So in the Horton case, the bankruptcy court held in this court, the Fifth Circuit, affirmed no value under 540HC. We have the exact opposite result in this case with virtually the same facts. So that's on my fraudulent transfer issues, and fraudulent transfer in good faith do work their way through many issues. But let me ask you this. The bankruptcy court didn't find, did it, that Mr. Templeton was put on inquiry notice of the Ponzi scheme when he was going after a sweet tax deduction? No, sir. I mean you're drawing that inference. No, sir. The bankruptcy court found that he was on notice of the tax – illegitimate tax scheme just like he found in Horton. He didn't find and there was no way that these guys would have known what Templeton was – or what Sterklow was doing with the illegitimate gains that he had from the investments. They didn't know where he was spending the money. In Horton, the court found that Horton really didn't care. So Mr. – let's take what he did at the beginning of this series. He put the money – Mr. Templeton put the money in and he thinks he's going to get a big tax deduction because of the way these deals operate, you know, for the reasons that your opposing counsel described, various alternatives. But he thinks he's going to get a big tax deduction. He does not know at that point, or at least the court didn't find that he knew, that this whole thing was never going to materialize, that it was just a shell and that Sterklow was going to just take the money and move on. I think he got pretty close to finding that, Your Honor. Well, what – I mean that's the – somewhere along this thing, maybe at the end certainly, he should have known if he didn't know. But at the beginning and partway along, all he knows from what I understand, and you need to correct me, is he's putting in a quarter of a million dollars or whatever, and he is getting – going to get $2 million in tax deductions. You know, in the cattle business, you've got to buy a lot of feed to get that kind of a multiple, but you can buy a lot of feed and get it. So he knows he's going to get a big deduction. He doesn't know that he's putting his $2 million in so Sterklow can rip it off. He doesn't know that, does he? And he knows he's going to get – that at the end of the first year, if things haven't materialized to his satisfaction, he in effect has a put back to AHF to get his money back. Sort of. The evidence painfully developed over five weeks of trial, the evidence we think is clear. Mr. Templeton would attempt after the fact to explain to us. We would say to Mr. Templeton, when you purchased an equity interest, many times a majority equity interest, Mr. Templeton and his parties, his buddies, would purchase 99% of this partnership. They would own virtually all the partnership, and we'd say you're a smart guy. You've been a lawyer for 50 years. You're very successful. You've made lots of money. Explain to me what you thought this partnership was going to do with your money. Was it going to buy an apartment complex and get some deductions, some real property deductions? Was it going to buy an apartment complex and then gift it to a 501c3 and get a charitable contribution deduction? Where were these deductions going to come from? The bankruptcy court found properly that these deals were nonsensical, had no economic basis, no economic reality. Mr. Templeton could not explain. Now, he used a lot of phrases, just like Mr. Lovell did, quite honestly, tax credits and low-income housing and tax-exempt bonds, but he could never explain in the basic level how they would work. For example? Well, that's because, I mean, I take it, a lot of, we used to call them mullets, a lot of these mullets, when they put their money in, they never know exactly how it's going to happen, but they put their money in because they credit the integrity and the experience of the manager of the mullets. And in this case, apparently, he had a history of, he knew about the history of Sturckwell et al. and credited, knew that they had various methods of doing this, and he didn't know how it was going to happen in this deal, and that is not uncommon for perfectly good-faith mullets. What Sturckwell didn't have, Mangef had, is no history of doing this. They had a history of buying low-income housing apartment complexes and having bona fide investors who knew what they owned and there were legitimate tax deductions that came out of those legitimate businesses. These shell entities that were, the testimony was, many times were never intended to buy or invest in real property. A simple example. They didn't tell him that. He didn't ask. He didn't know. But that's the point. How did he know that they weren't, that they were doing something different than what they'd been doing all along, which were legitimate low-income housing limited partnerships? Well, the bankruptcy court found because they never made any sense. For example, if on, I think it's M2M number two, Mr. Templeton invested $450,000, he got a K-1 that showed that his capital contribution was not $450,000, it was $2.4 million, which clearly was wrong, and he should have known that I didn't put in $2.4 million here, but it needed to show that for him to take a $2.4 million deduction, for example, in some of the deals. Then the partnership would give him a $2.4 million tax deduction for a charitable tax deduction, which means the partnership gave something away worth, since he only owned half the partnership, it had to give something away worth $4.5 million or $5 million. We would say to him, what did you think your partnership owned worth $4 or $5 million that it could charitably donate to someone? I have no idea. How could it acquire an asset worth $5 million when you only put $450,000 in it a few months earlier? Did it borrow money? Did it buy something that you – did you know about? We think the bankruptcy court found correctly that the partnerships were too good to be true. At the inception, the premise was these were too good to be true. You should have looked further into the deal. And it harmed other creditors of AHF. How exactly? Because we know Sterkle was perpetrating a massive Ponzi scheme, a massive illegitimate scheme. It harmed creditors because these guys participated in that to get their wildly beneficial tax deductions and their way above market interest rates. Most times promise was 18 percent in one year. They were participating in that, which allowed AHF to continue operating and to continue incurring new debts the next day and to continue bringing in new investors that couldn't be paid. So you really do have to find that Mr. Templeton had real knowledge of, at least enough knowledge, of the fraudulent nature of this scheme from the get-go, that he was not just the ordinary dumb mullet. Mullets are sometimes not dumb. I mean, they're usually pretty smart. That's how they get the money to be mullets. But he would have to know something about the fraudulent nature of this scheme to begin with in order to be held responsible for the damage that was done to this third-party AHF. Exactly. And the bankruptcy court found, after lots and lots and lots of testimony, that the deals were – these are the bankruptcy judge's words – the deals were nonsensical. The deals lacked economic reality. The deals were too good to be true. And Templeton was complicit with Sterkle at the threshold of the deals. Those are pretty strong findings of fact. I think they fall just a hair short of he knowingly and intentionally participated. He didn't go that far. I haven't heard anybody say that the bankruptcy court closed that gap and said because he went in the deals that were too good to be true, he was put on inquiry notice of the Ponzi scheme. The Ponzi scheme is what harmed the creditors. You're exactly right. No one is alleging that they knew or should have known of the Ponzi. And that's what damaged creditors. That's right. But the way the Ponzi was able to be operated was the illegitimate tax scheme. So he was on notice of the illegitimate tax scheme, which he ignored. He intentionally put his head in the sand. He was willfully blind. And I think the law on good faith, the entire body of law on good faith, seems to say if there are sufficient red flags, that the transaction is suspicious. You have a duty to look further. An investor can't stick his head in the sand and be willfully blind and say, but I didn't know. The courts – I think the entire body of good faith – good faith is not defined in the bankruptcy code, so we have to kind of look at it on a transaction-by-transaction basis. But the entire body basically says if there are sufficient red flags to put an objective person on notice that there's either a fraudulent scheme or insolvency, you need to look further. You need to inquire further. All this thing is all the more complicated here because we're not talking about one chain here. We're talking about the bankruptcy of the general partner, which is not the outfit that he made the investment in. So you're saying he had to be on notice of all the shenanigans that were going on by Sterkwill in the general partner or the owner of – and incidentally, he wasn't always the general partner. He might have been only the owner of – he was a subsidiary of the general partner. So he had to be on inquiry notice of all the things that were going wrong in the general partner, all the illegitimacy that was being spawned by the general partner, which is one – which is not the normal case. I mean the normal case is the trouble is in the entity I'm investing in. That's not true here. But here the testimony was absolutely unequivocal that I – that Templeton and the other investors never looked to these shell new partnerships to pay them back. They never thought these partnerships were going to have any business operations or income or ability to pay their equity investment back. They always looked to AHF on the AHF guarantees. AHF was an integral part of these transactions, and they wouldn't have done them but for AHF's involvement, which does, before I run out of time, lead me into an equally strong argument. When we objected to these claims, the bankruptcy court said, and correctly, the gist of the claims against AHF are these purported guarantees where AHF said, I know you've made an equity investment in a partnership. And normally, of course, equity investments either get paid back or not based on the profitability of your enterprise. But this was a little unique. Purportedly, AHF was guaranteeing that – AHF was saying if the partnership does not comply with its promise to give you back your equity investment within one year, we will back that. We will be a guarantor. So we're guaranteeing the partnership's promise to you. Apparently, in this work, in this business, that's common. That's how it's done. It is not. Mr. Lovell's wrong. It is not. What – this gets a little confusing. In the tax credit world – I hate to get into this because it's pretty confusing. In the tax credit world, when a partnership is awarded tax credits that it can give to its new limited partners as incentive for them to invest in low-income housing, those tax credits are taken over a 15-year period of time. You don't take them off once. Whoever owns the tax credit. And so a tax credit investor will invest a million dollars, and it will hope to get tax credits over a 10- or 15-year period of time of the ownership of the apartment. But there are a lot of ways you can lose that tax credit along the way. If the property is foreclosed on, if you sell it early, if you – it goes broke and can't pay its bills. Lots of ways that can end. Well, the tax credit investor says to himself, I'm going to buy these tax credits, but I want to make sure the general partner does what he says he's going to do. Operates responsibly, keeps the property for the 10 years necessary because I don't want to have recapture. I don't want to give back my tax credit. So there will be a contract with the general partner, and the limited partner will say to the general partner, if you don't do these things that you're promising me, then you owe me money. You owe me. But there are not – there are not guarantees that say if you will invest in the equity, I promise you you'll get your equity back, period. These are very unique. So the bankruptcy court and the trustee went to look at the guarantees, and we said Mr. Lovell says just what he just told you. AHF guaranteed that you'll get your money back. That guarantees have to be in writing and specific and contractual. These guarantees did not guarantee that. These guarantees were nonsensical, the judge said, and he said none of these guarantees are valid, enforceable, contractual guarantees because they do not guarantee what he says they guarantee. Many of them said AHF guarantees the partnership's obligation to you, Mr. Templeton, under the loan documents. Bankruptcy court said there are no loan documents. You made equity investments. There's nothing to guarantee. Many of the other ones said if the partnership has an obligation to return your capital by a certain date and doesn't, AHF will be liable for that. We then went to the partnership agreements. The partnership agreement said if you put your equity capital in by a specified date, I promise to give it back to you by a certain date. The bankruptcy court looked at the facts, and none of the capital came in by the required date. They all came in after the date, and the bankruptcy court said I'm sorry. The guarantees don't guarantee your equity investment because they came in too late. So our premise at the bankruptcy court was. Well, doesn't that mean you just disallow the claim? Absolutely. But, you know, you don't have to get into all this, the rest of it. You just say, well, that guarantee didn't work as it happens, so your claim gets disallowed because it wasn't triggered, but you don't have to get into all this. That's exactly what I was going to say. End of story. If their claims are based on a guarantee that fails, they don't have a claim, then their claims are disallowed. We don't need to subordinate anything, and we don't need to re-cure it. Well, then, of course, what they say is, though, that I get the money. I get a claim on some other basis. That's right. You get rid of the guarantee claim. Now you get to your fraud, breach of fiduciary duty claims. The Horton court said, affirmed by the Fifth Circuit, said you don't have a fraud or breach of fiduciary duty claim when the claim is arising out of an illegitimate transaction that you participated in. When the claim arises out of an illegitimate tax scheme that you knew or should have known you were participating in, you don't have a fraud claim. Fraud claims can't come out of that. That's what Horton said. That's what the Fifth Circuit approved, and that's what we think should occur here. Okay. I ran out of time. I'm sorry. All right. Thank you very much. Thank you. May it please the court. The trial court did not find a Ponzi scheme. He was asked, you heard the word Ponzi scheme several times in the last 35 or so minutes, and the court was certainly asked to do so, and the court did not find a Ponzi scheme. In fact, there's an interesting progression of opinions by the court in that connection. In the first case where the court addressed whether or not there was a Ponzi scheme, that's the case we call the Rice case. It's actually styled housing for Texans. The court found a Ponzi scheme. That was earlier in these proceedings after a three-day trial. During that three-day trial was during the early part of our trial. Then in our case, he was asked to find a Ponzi scheme. He did not. There are no findings of Ponzi scheme or conclusions. In the case that immediately followed us, what we call the Kaler case, the court came right out and said he stopped short of finding that there is a Ponzi scheme. And I think that's pretty telling on the development of the evidence. So to say now that, well, Mr. Templeton was complicit in knowing of a Ponzi scheme, that's just simply untrue. There's no basis for that in the record. What about knowledge of what he was doing with the money that was being fed from the limited partners? None. Mr. Templeton? What you mean, did Mr. Templeton know that Sterkle was stealing the money and spending it on all kinds of things? And returning it to investors? No. He did not. And there's no evidence of that. There's no findings of that. In fact, the findings, I'll read some to you. Conclusion of law number 16, Mr. Templeton invested real and substantial dollars and lost real and substantial dollars. Conclusion of law 33, he put up real dollars. 41, Mr. Templeton no doubt, no doubt gave value in the amount of each of his investments. Conclusion of law 44, Mr. Templeton maintains his good faith defense. Conclusion of law 41 again, Mr. Templeton's investments well exceed the transfers. He cannot be a net loser if he doesn't give value. The court found value. When you look at the court's findings of fact and conclusions of law with these questions in mind that you've just now been asking, what you see is that the court's findings, and he says this, the court's findings were addressing the question of risk. Did Mr. Templeton know the risk of the investments he was making? And he concluded, yes, Mr. Templeton knew that these were risky ventures. He knew it was an equity-type risk. Therefore, the court says, he recharacterized. But the problem is that is not the correct approach. And what we see is the trial court was applying an equitable subordination analysis to guarantees. And the court, much as Mr. McCartney, the court just lumped everything together and said, well, these deals, the Templeton deals. And this court has said on many occasions in other courts you have to look at each transaction. Each transaction rests on its own set of facts. Each transaction you have to look at at the time the person entered into the transaction. There are no findings, and there is no testimony that Mr. Templeton knew there was any type of scheme or anything wrong at the outset of these transactions, or even until after Mr. Sterkle committed suicide. And that's what then started the whole ball rolling of people finding out what had actually happened. And when he talks about Mr. – he says, for example, he said that Mr. Templeton understood the tax aspects, yet his own expert and Mr. McCartney himself in arguments said that they did not expect Templeton to understand the details of the tax deductions, how they work, or anything else. The sole question was, well, should he have picked up the phone and called somebody, going to the good-faith test that we see articulated in the Bayou cases? That was the sole thing. And what the court ultimately held was that Mr. Templeton was in good faith. And it makes sense. Mr. Templeton was in good faith because what he knew about were the risks of these transactions, and we don't disagree. He didn't know about the risk of the transaction. What he knew the risks were, the equity risks, were the risks involved in the limited partnerships, not in the guarantee of those limited partnerships by American Housing Foundation. And then the guarantee, of course, is an independent obligation. The Walden II guarantees even say that. They're independent obligations, independent of anything that's in the limited partnership agreements. The – what makes – when the court says, well, these were illegitimate deductions, yeah, they were, but not known at the time. They were illegitimate based upon what Stirkwell did not do. He never performed the transactions. He took the money. He even created – we now know – he created tax returns or information returns for these partnerships. He filed information returns. One in particular is the LIHTC Community Development No. 2, which was an embedded partnership that ended up reaching out and hurting a lot of people because of the K-1s he threw off for that. Well, it turns out this massive tax return that had all these transactions involved, Stirkwell never did any of them. He just made up an information return, didn't tell anybody, filed it with the IRS, sent out K-1s. People take deductions based on their K-1s, and it's caused a lot of problems. For these reasons and those that were stated in the brief, we ask that you reverse the court's ruling with regard to subordination and recharacterization and affirm. Thank you. Thank you very much, and thank you for your argument.